**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
PECOS DIVISION**

| | | |
|---|---|---|
| **SERGIO TIJERINA-SALAZAR,** | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **No. PE:19-CV-00074-DC** |
| | § | |
| **FERMIN VENEGAS, III,** *et al.*, | § | |
| *Defendants.* | § | |

<u>**ORDER**</u>

BEFORE THE COURT are (1) Defendant Venegas Contractors, Inc.'s ("VCI") Motion for Final Summary Judgment (Doc. 150); (2) Defendant Fermin Venegas Shearing, Inc.'s ("FVS") Motion for Final Summary Judgment (Doc. 151); (3) Defendant Fermin Venegas, III's ("Venegas") Motion for Final Summary Judgment (Doc. 152); and (4) Plaintiff Sergio Tijerina-Salazar's ("Plaintiff") Motion for Partial Summary Judgment (Doc. 153). For the reasons set forth below, Defendant VCI's Motion for Final Summary Judgment is **GRANTED** (Doc. 150), FVS and Venegas's Motions for Final Summary Judgment are **DENIED** (Docs. 151, 152)**,** and Plaintiff's Motion for Partial Summary Judgment is **DENIED** (Doc. 153).

**I.    BACKGROUND**

**A.    Facts**

This dispute involves Plaintiff's employment for VCI, FVS, and Venegas (collectively, "Defendants"), as an H-2A visa recipient. In 2011, Plaintiff, a Mexican national, contacted Venegas about working for him in the United States. (Doc. 152-9 at 24:14–29:24). To enter the United States, Plaintiff required approval for an H-2A or H-2B visa issued by the United States Department of Labor. 8 U.S.C. §§ 1101(a)(15)(H)(ii)(a), 1188(a). Plaintiff utilized the H-2A visa, with his applications listing "sheep shearing" as among his duties, and omitted any reference to mechanic work. (Docs. 153-24, 153-25). After receiving an H-2A visa, Plaintiff

1

entered the United States and began working for Venegas in 2012.  (Doc. 152-10 at 15:17–22).

Accompanied by additional H-2A applications and approvals, Plaintiff continued to work for

Venegas for several more years.  (*Id.*).  Plaintiff was allegedly employed by Venegas at all

relevant time periods specified in the H-2A visas.  (Doc. 47 at 13–16).

Plaintiff's employment under Venegas entailed conducting repairs to machinery and

trucks, including caterpillars, forklifts, saws, welding machinery, and wool processing equipment

such as energy generators, wool presses, trailer lights, and compressors.  (Docs. 152-9 at 44:17–

19; 152-10 at 55:15–21).   Plaintiff's activities in large part consisted of maintenance of

equipment used to shear sheep and construct fences.  (Doc. 152-9 at 77:3–78:4).  Plaintiff

conducted most of his work on Venegas's own property.  (Docs. 153-3 at 228:10–20; 153-19

¶ 4).  Plaintiff did not shear, assist in the physical act of shearing sheep, or travel to Colorado or

Wyoming to shear sheep.  (Docs. 153-6 at 42:7–18; 153-13 at 2).  Venegas allegedly employed

fifty-three (53) other H-2A workers throughout the duration of Plaintiff's employment.  (Doc. 47

at 17).

Plaintiff's H-2A visa applications stated that he was to be compensated for his work

pursuant to the hourly rate listed on each application.  (Docs. 47-1, 47-2, 47-3).  The parties

dispute whether Plaintiff's employer(s) kept an accurate record of the hours Plaintiff worked per

day.  (Docs. 151 at 16; 169 at 22).  Plaintiff now asserts he was exploited by Defendants in a

racketeering scheme which allowed them to pay Plaintiff depressed wages for his work.  (Doc.

47 at 1).  Plaintiff alleges he was employed to support Venegas's contract fencing business, as

opposed to any sheep shearing business, in Texas and New Mexico.  (*Id.* at 13).  Plaintiff further

alleges Defendants, by enacting a "massive visa fraud" on the United States and himself,

benefited financially by only paying Plaintiff the hourly wages required under the H-2A

applications for "agricultural" work, the adverse effect wage rate ("AEWR"), as opposed to those which Plaintiff claims he should have been paid for "non-agricultural" work, or the higher prevailing wage pursuant to an H-2B visa.  (*Id.* at 2, 6).

## B.     Procedural History

Plaintiff filed the instant lawsuit on December 19, 2019.  (Doc. 1).  Plaintiff filed a Second Amended Complaint on April 23, 2021.  (Doc. 47).  Plaintiff's Second Amended Complaint presents four separate causes of action.  (*Id.*).  First, Plaintiff claims Defendants violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq.*, by failing to pay Plaintiff "at least the minimum wage for all hours worked," as well as "the required overtime wages for all hours worked over 40 hours during each week."  (*Id.* at 19–20).  Plaintiff's second federal law claim is for a violation of § 1962(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq.*  Plaintiff asserts Defendants operated a RICO enterprise which, through visa fraud as defined by 8 U.S.C. § 1324 and 18 U.S.C. §§ 1351 and 1546, "reduc[ed] their labor costs under a series of annual H-2A visa applications . . . for the unlawful purpose of exploiting foreign laborers for their own financial gain."  (*Id.* at 22–23).  As a related claim, Plaintiff also asserts Defendants conspired to violate § 1962(d) of RICO by engaging in immigration fraud as defined by 8 U.S.C. § 1324 and 18 U.S.C. §§ 1351 and 1546, whereby Defendants "shared among themselves proceeds from [the] exploitation of laborers while [they] all knew that H-2A laborers were only available to [] Defendants due to visa fraud and assignment of unauthorized work."  (*Id.* at 26–27).

Plaintiff also asserts a state law claim for breach of contract. Plaintiff asserts although he "satisfactorily performed" his duties and responsibilities under his employment contracts, Defendants failed to comply with provisions of the contracts concerning "hours, records, pay,

work type, earnings statements, FLSA compliance, wages . . . , and reimbursement for travel and related costs." (*Id.* at 20–21).   In the alternative, Plaintiff alleges a claim for quantum meruit, asserting he is entitled to "the appropriate prevailing wage in effect at the time" of Plaintiff's employment. (*Id.* at 21–22).

On January 31, 2022, Plaintiff and each Defendant filed cross-motions for summary judgment. (Docs. 150, 151, 152, 153).   Defendants also incorporate by reference the grounds raised in each other's motion for summary judgment.   However, Defendants fail to identify with detailed particularity what specific grounds they incorporate in the various motions for summary judgment.   Accordingly, the Court concludes as a matter of law that Defendants have failed to incorporate by reference any grounds raised independently in each Defendant's summary judgment motion.   Plaintiff seeks partial summary judgment, while Defendants request final summary judgment as to all pending claims.   All parties have filed responses and replies to their respective motions. (Docs. 162, 166, 169, 170, 174, 175, 176, 186).   The summary judgment motions have been fully briefed and are ripe for review.

## II.   LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).   Federal Rule of Civil Procedure 56 allows a party to move for summary judgment when the party contends no genuine issue of material fact remains, and the party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).   "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Fisk Elec. Co. v. DQSI, L.L.C.*, 894 F.3d 645, 650 (5th Cir. 2018) (internal quotations omitted); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party seeking summary judgment bears the initial burden of informing the court of its motion and identifying "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" that demonstrate the absence of a genuine issue of material fact.  Fed. R. Civ. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 323.  The "movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact."  *Triple Tee Golf, Inc. v. Nike, Inc*., 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex*, 477 U.S. at 322–25).  If the movant bears the burden of proof on a claim or defense for which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense."  *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  *Celotex*, 477 U.S. at 325; *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000).  While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case.  *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted).  "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response."  *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

After the moving party has met its burden, to "avoid a summary judgment, the nonmoving party must adduce admissible evidence which creates a fact issue concerning the

existence of every essential component of that party's case." *Thomas v. Price*, 975 F.2d 231, 235 (5th Cir. 1992). The party opposing summary judgment cannot merely rely on the contentions contained in the pleadings. *Little*, 37 F.3d at 1075. Rather, the "party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 457, 458 (5th Cir. 1998); *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). Although the court views all evidence and factual inferences drawn therefrom in the light most favorable to the nonmoving party to determine whether that evidence could sustain a jury verdict in its favor, *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008), the nonmovant's "burden will not be satisfied by some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). Similarly, "unsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat a motion for summary judgment." *Clark v. Am.'s Favorite Chicken,* 110 F.3d 295, 297 (5th Cir. 1997).

In deciding a summary judgment motion, the district court does not make credibility determinations or weigh evidence. *E.E.O.C. v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 612 n. 3 (5th Cir. 2009). Nor does the court "sift through the record in search of evidence to support a party's opposition to summary judgment." *Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 379-80 (5th Cir. 2010). Therefore, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003).

Notably, cross-motions for summary judgment must be considered separately, and each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 538–39 (5th Cir. 2004); *Bricklayers, Masons & Plasterers Int'l Union of Am. v. Stuart Plastering Co.*, 512 F.2d 1017, 1023 (5th Cir. 1975). Thus, where the parties disagree as to the facts and propound inconsistent legal theories, the mere filing of cross-motions for summary judgment does not warrant the entry of such judgment.

### III.   DISCUSSION

#### A.   H-2A Program and Application Process

Immigrant "[g]uest workers can come to the United States to work for a temporary period of time, usually less than one year, with an H-2A or H-2B visa." Jennifer J. Lee, *Private Civil Remedies: A Viable Tool for Guest Worker Empowerment*, 46 LOY. L.A. L. REV. 31, 41 (2012). The H-2A program's roots lie with the original Immigration and Nationality Act ("INA"), enacted in 1952, which discussed a unitary "H-2" initiative. *See* Pub. L. 82-414 § 101(15)(H)(ii) (1952). In 1986, the Immigration Reform and Control Act divided the H-2 program into two components: (1) the H-2A subprogram for temporary guestworkers in agriculture, and (2) the H-2B subprogram for nonagricultural workers. Pub. L. 99-603 § 301(a) (1986); *Everglades Harvesting & Hauling, Inc. v. Scalia*, 427 F. Supp. 3d 101, 104 (D.D.C. 2019).

A prospective employer seeking to obtain an H-2A Temporary Labor Certification ("TLC") must undergo a multi-step application process as instructed by the United States Department of Labor ("DOL"). Agricultural employers are permitted to hire nonimmigrant aliens as workers under the H-2A program if they first obtain from DOL certification that (1) there are insufficient domestic workers who are willing, able, and qualified to perform the work

at the time and place needed; and (2) the employment of aliens will not adversely affect the

wages and working conditions of domestic workers.  8 U.S.C. §§ 1184(c)(1), 1188(a)(1).  The

District Court for the District of Columbia summarized the process:

> First, the employer submits a "job order" to a state agency between sixty and seventy-five days before the labor is needed.  *See* 20 C.F.R. § 655.121(a).  The state agency checks for compliance with DOL regulations, classifies the type of job the employer seeks to fill, and attempts to recruit U.S. workers to fill that job. *See id.* § 121(b)(1), (c).  Second, while the state agency is completing these steps, the employer submits an H-2A application and supporting documentation to the DOL no less than forty-five days before the labor is needed.  *See id.* § 655.130(b).  Third, DOL employees then review the application for compliance with all applicable program requirements.  *See id.* § 655.140(a).  Within seven days of receiving the H-2A application, a DOL Certifying Officer ("CO") issues either a Notice of Acceptance ("NOA") or a Notice of Deficiency ("NOD").  *Id.* §§ 655.141(a), 655.143(a).  NODs identify the reasons the employer failed to meet the H-2A program's criteria and, if applicable, list the modifications required for acceptance.  *See id.* § 655.143(b).  If the employer submits modifications, the CO will review and either accept or deny the modified application.
>
> [If] their application for an H-2A TLC is denied, an employer has seven days to request either an expedited administrative review by, or a de novo administrative hearing before, an Administrative Law Judge ("ALJ").  *See id.* §§ 655.164(b), 655.171.  If the employer does not request such a review within seven days, the CO's decision is final.  *See id.* § 655.164(c).  If the employer requests an expedited review, the ALJ will review the written record and any written submissions within five days of receiving the administrative record and either affirm, reverse, or modify the CO's decision, or remand to the CO for further action.  *See id.* § 655.171(a).  If the employer requests a de novo hearing, the ALJ will schedule a hearing for within five days of receiving the administrative record, consider any new evidence, and render a decision affirming, reversing, or modifying the CO's determination, or remand to the CO for further action, within ten days of the hearing.  *See id.* § 655.171(b).  The ALJ's decision after either an expedited review or a de novo hearing is the final decision of the Secretary [of Labor].  *See id.* § 655.171.

*Everglades*, 427 F. Supp. 3d at 105–06.  The parties do not dispute that each H-2A application

for Plaintiff[1] was certified by the DOL, and that no NOD was ever issued.  (Docs. 151 at 5–6;

---

[1] The Court observes that it is the *employer*, not the *employee*, that is responsible for submitting the H-2A applications on behalf of the employee.  *See, e.g.*, *Everglades*, 427 F. Supp. 3d at 106.  Venegas admitted that he himself, and not Plaintiff, applies for his workers' H-2A visas.  (Doc. 151-8 at 105:7–9).

169 at 18; 174 at 4).   Therefore, there was no cause for Plaintiff to seek review of the applications by an ALJ prior to commencing his employment.

The pay structure for H-2A and H-2B workers differs, as the rate by which they are paid is tied to the classification of worker.  As the District Court for the Western District of Texas has described it:

> Job offers to H-2A workers must comply with the federal regulations and include minimum benefits, wages, and working conditions, as detailed in 20 C.F.R. § 655.122.  For example, employers are required to provide housing, workers' compensation, meals, transportation, guaranteed pay, keep earnings records, furnish hours and earning statements, and pay workers at least twice monthly. [*Id.*] § 655.122. . . .  In addition, H-2A employers must pay a wage that is the highest of (1) the adverse effect wage rate ("AEWR") in effect at the time the work is performed, defined at 20 C.F.R. § 655.103(b); (2) the prevailing hourly wage or piece rate; (3) the agreed-upon collective bargaining wage, or (4) the federal or state minimum wage, "except where a special procedure is approved for an occupation or specific class of agricultural employment."  [*Id.*] § 655.120(a); § 655.122(d)(1).

> The employer must also provide written work contracts to the worker by the time he appears for work, at the very latest, and if the employer fails to do so, the required terms of the job order and the certified application will be the work contract.  § 655.12(q).  "At a minimum, the work contract must contain all of the provisions required by" the regulations.  *Id.*

> H-2B visas, which are for non-agricultural workers, function in a similar fashion. However, prevailing wage rates of pay for non-agricultural work ***are higher than those for agricultural workers.***

*Rodriguez-Meza v. Venegas*, No. DR-17-CV-54-AM/CW, 2018 WL 7348864, at *3 (W.D. Tex. Sept. 27, 2018) (emphasis added).  Thus, an employer seeking the services of H-2A workers must compensate them at a rate not less than the federal minimum wage, the prevailing wage rate in the area, or the AEWR, whichever is highest.  *See* 20 C.F.R. § 655.102(b)(9).  The AEWR is the minimum wage rate that the DOL determines is necessary to ensure that wages of similarly situated domestic workers will not be adversely affected by the employment of immigrant H-2A workers.  *Id.* § 655.120(a); § 655.122(d)(1).

**B.    Venegas Contractors, Inc.'s Motion for Final Summary Judgment**

VCI moves for summary judgment as to all of Plaintiff's claims.  (Doc. 150).  VCI argues that it never conducted any business, or employed or caused harm to Plaintiff.  (*Id.* at 6).  Plaintiff claims Venegas is the sole owner of VCI and does not observe corporate formalities, VCI stands to disguise Venegas's illegal activity, and VCI invoiced Venegas's fencing customers and served written discovery to Plaintiff.  (Doc. 166 at 1–2).

The Court finds that VCI is not a proper Defendant in this case.  Texas law governs the state law claims in this case.  Under Texas corporation law, a corporation is separate from its officers and shareholders as entities.  *Doyle v. Kontemporary Builders, Inc.*, 370 S.W.3d 448, 457 (Tex. App.—Dallas 2012, pet. denied).  The evidence indicates VCI was incorporated on July 14, 2016, by the filing of its corporate charter with the Texas Secretary of State.  (Doc. 150-7 at 1).  On January 25, 2019, the Texas Secretary of State declared VCI's existing charter forfeited for tax-related reasons.  (Doc. 150-8).  Plaintiff advocates for disregarding VCI's corporate existence premised upon a suspended resuscitation granted by Texas tax-revival law. (Doc. 166 at 2).  The Western District of Louisiana case cited by Plaintiff, *Rich Land Seed Co., Inv. v. Memphis Light Gas & Water*, is inapposite because it only involved Louisiana

corporations, which are not incorporated in Texas.  *See generally* No. 3:21-CV-01865, 2022 WL 495913 (W.D. La. Feb. 2, 2022).

Although Texas state law allows for the possibility of revival for corporations afflicted by tax forfeiture, this possible escape from the taxation cave permitting the limited existence of a corporation does not give way to liability.  *See Lighthouse Church v. Tex. Bank*, 889 S.W.2d 595, 600–01 (Tex. App.—Houston [14th Dist.] 1994, writ denied) (citing Tex. Tax Code Ann. § 171.313).  Foregoing the formal separation between VCI and Venegas in favor of treating VCI as the alter ego of Venegas based on tax forfeiture and revival laws would resemble the rejection of two independent pillars of a bridge in favor of a single elongated lily pad.  Although VCI produced a single discovery response, served one on Plaintiff, or filed evidentiary motions, this is no great presage.  (Docs. 153-14; 166 at 1–2).  Defunct corporations are permitted under Texas law to defend themselves in lawsuits; the phenomena that Defendants are all represented by the same counsel and have an affiliation with Venegas do not support the conclusion that VCI's existence as a separate corporate entity should be disregarded.  *See Cognata v. Down Hole Injection, Inc.*, 375 S.W.3d 370, 375 (Tex. App.—Houston [14th Dist.] 2012, pet. denied).  The Court requires some evidence that VCI employed Plaintiff before it can endorse an incremental yet illimitable approach to disregarding its formal corporate existence—otherwise, the Court will needlessly boil a frog that Texas revival law never intended to leave the lily pad.  The Court finds that VCI has met its burden to show that there is no issue of material fact as to whether VCI is defunct, inoperative, and engaged in no business or employment dealings with Plaintiff, and Plaintiff has not satisfied his own burden in response.

To the extent that Venegas testified in his discovery responses that he was the "sole proprietor" of VCI in response to an interrogatory asking him about any businesses he

participated in since 2015, this also does not warrant piercing VCI's corporate veil.  (Docs. 153-12 at 12; 153-13 at 3).  Virtually none of the deposition testimony to which Plaintiff refers for the proposition that Venegas failed to "observe corporate formalities" makes any mention of VCI, but rather only implicates FVS.  (Docs. 153-3 at 28–29 (money deposits); 153-18 (interrogatory exclusive of VCI)).  If anything, the workers' compensation policy Plaintiff cites lists "Venegas Contractors" as the "doing business as" nominal of a company called "Genesis Wire Inc.," which is not a party to the instant suit.  (Doc. 153-4 at 12–14).

Further, all four of Plaintiff's claims as presented against VCI necessitate VCI's status as Plaintiff's employer at all relevant times.  The evidence demonstrates "Venegas Contractors" is merely a nickname of FVS as well as Venegas, and that VCI as an entity has itself conducted no business and has no employees.  (Docs. 150-1 at 4; 153-14 at 1).  On all relevant documents, from Plaintiff's employment contracts to Plaintiff's own visa, Venegas and/or FVS are the only entities listed as Plaintiff's employers.  (Docs. 150-9; 150-10).  Additionally, Plaintiff's paychecks display FVS as his payor, and not VCI.  (Doc. 150-3 at 2).  On the H-2A applications as well as the clearance orders issued by the DOL following their approval of Plaintiff's H-2A visa, only FVS is listed.  (Doc. 150-2 at 1, 8).  The existence of a handful of invoices including "Inc." at the end of "Venegas Contractors" is insufficient to confute VCI's evidence and raise a fact issue to preclude summary judgment in favor of or otherwise attribute an operative legal status onto VCI.  (*See* Docs. 154-7; 154-8).

In sum, the Court finds that VCI has been forfeited as a corporation and has never performed any business or employed Plaintiff.  Plaintiff's cited evidence does not raise a genuine issue of material fact as to VCI's involvement in Plaintiff's employment.  The evidence before the Court could not lead a reasonable juror to conclude that VCI somehow existed as a defunct

shadow corporation and employed Plaintiff under the reverse-guise of FVS and Venegas.  Thus, VCI has demonstrated as a matter of law that it did not employ Plaintiff, conduct business, or act as a veil for Venegas's alleged fraud.  Accordingly, VCI's Motion for Final Summary Judgment is **GRANTED**.  (Doc. 150).

## C.    Standing

FVS and Venegas each separately assert that Plaintiff is unable to pursue under RICO or the FLSA alleged breaches of any H-2A employment contracts in this Court because there exists "no private cause of action" to do so.  (Docs. 151 at 2, 6; 152 at 10–11).  FVS and Venegas cite the INA at 8 U.S.C. § 1188 as the statutory provision which purportedly lacks any mention of a federal cause of action for remedying Plaintiff's alleged injuries.  (Docs. 151 at 6; 152 at 10–11).  As discussed above, the INA allows for the admission of immigrant workers to temporarily gain admission to the United States in order to perform agricultural services or labor under the H-2A program.  8 U.S.C. §§ 1188, 1101(a)(15)(H)(ii)(a).

The statute indeed does not expressly allow for a private cause of action.  *See generally* 8 U.S.C. § 1188.  While FVS and Venegas are correct in their observation that the United States Court of Appeals for the Ninth Circuit rejected the possibility of an implied private right of action under the INA in *Nieto-Santos v. Fletcher Farms*, 743 F.2d 638 (9th Cir. 1984), the instant case is distinguishable—not a single element of the Second Amended Complaint relies on 8 U.S.C. § 1188 as a cause of action.  (*See generally* Doc. 47).  In addition, *Nieto-Santos* dealt with individuals who were seeking "a cause of action for breach of an employment contract" which arose solely under state law.  *Nieto-Santos*, 743 F.2d at 641.  In this case, Plaintiff premises his causes of action on RICO and the FLSA, and tacks on the state law-based breach of contract and quantum meruit claims under this Court's supplemental jurisdiction.  (*See generally*

Doc. 47); *see also Calixtro-Calixtro v. Estate of Hodges*, NO. 1:17-CV-394-LY, 2018 WL 5839690, at *9–11 (W.D. Tex. Nov. 7, 2018) ("Calixtro is not attempting to bring a claim under the INA[, but rather h]e brings a claim for violation of the FLSA and a state-law breach-of-contract claim under this court's supplemental jurisdiction."). Even assuming *arguendo* that the instant case was *Nieto-Santos*'s jurisprudential kindred spirit, the Ninth Circuit's decision is only persuasive, and is not controlling on this Court. The Court declines to follow it at this time. Accordingly, the Court **DENIES** FVS and Venegas's Motions for Final Summary Judgment as to Plaintiff's standing under RICO and the FLSA. (Docs. 151, 152).

## D.    FVS and Venegas are Proper Parties

Next, FVS and Venegas argue Plaintiff utilized the wrong "process to challenge the wage rate of an H-2A worker," in that Plaintiff should have instead brought his complaints against the DOL's Wage and Hour Division. (Docs. 151 at 7–8; 174 at 5). The Court concludes that the specific wage rate is not challenged as it pertains to the DOL or the INA; rather, Plaintiff claims the DOL *itself*, along with Plaintiff, were defrauded. (*See generally* Doc. 47; *see also* Doc. 169 at 11). Essentially, from the DOL's perspective, the approved wage rate was appropriate to compensate an *H-2A* worker. (*Id.* at 10–11). As FVS and Venegas concede, the DOL regulations and INA statute allow for the Secretary of Labor to review DOL assignments and approve wage rates under the H-2A program. (Docs. 151 at 6–7; 152 at 13–14); 29 C.F.R. § 501(c). The H-2A regulations, however, "do not state that the authority lies exclusively with the Wage and Hour Division," and the Court will not imply an exclusive authority at this time. *Calixtro-Calixtro*, 2018 WL 5839690, at *9–10.

Plaintiff's claims rest upon FVS and Venegas's purported fraud conducted on both himself and the DOL. Thus, this action is not one brought against the DOL as an attempt to

invalidate the administrative adjudication, but instead against Defendants under RICO and the FLSA for various frauds. *See Ruiz v. Fernandez*, NO: CV-11-3088-RMP, 2012 WL 1442556, at *5 (E.D. Wash. Apr. 26, 2012) ("Individuals may pursue a private cause of action for damages under the FLSA in either federal or state court up until such time as the [DOL] files its own action under the FLSA.").

A nearly identical argument to the one proffered here—that because there is no private cause of action to enforce the H-2A regulations, Plaintiff cannot bring related federal and state law claims predicated upon violations of said regulations—has been rejected elsewhere in the Western District of Texas. *See Rodriguez-Meza v. Venegas*, No. DR-17-CV-54-AM/CW, 2018 WL 7348864, at *39–41 (W.D. Tex. Sept. 27, 2018); *see also Calixtro-Calixtro*, 2018 WL 5839690, at *9–11. FVS and Venegas have offered no counter to the applicability or reasoning of these prior adjudications, and the Court finds their and rationale to each be cogent. As FVS and Venegas have asserted no valid objection to Plaintiff's ability to bring a private cause of action for alleged visa fraud, immigration fraud, and the state breach of contract and quantum meruit claims, the Court must reject FVS and Venegas's challenges. Accordingly, the Court **DENIES** FVS and Venegas's Motions for Final Summary Judgment in this regard. (Docs. 151, 152).

E.    **Agricultural Work versus Nonagricultural Work**

Plaintiff, FVS, and Venegas all request that this Court make a finding as to the nature of the labor Plaintiff performed for Defendants throughout his employment. (Docs. 151 at 13–14; 152 at 14–17; 153 at 6–14). Indeed, a majority of Plaintiff's pending claims depend entirely upon whether his work as part of his employment with Defendants was "agricultural." (*See generally* Doc. 47).

The INA defines the term "immigrant" as it relates to agricultural labor to be:

[A]n alien . . . having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform agricultural labor or services, as defined by the Secretary of Labor in regulations and including agricultural labor defined in [S]ection 3121(g) of Title 26, agriculture as defined in [S]ection 203(f) of Title 29[] . . . , or (b) having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform other temporary service or labor if unemployed persons capable of performing such service or labor cannot be found in this country.

8 U.S.C. § 1101(a)(15)(H)(ii).

The DOL is tasked with defining "agricultural labor or services."  *See id.*  Under the current regulations, promulgated in 20 C.F.R. § 655.103(c) and most recently updated in 2020, the DOL's definition of "agricultural labor or services" nearly "mirrors the [INA] statute," with the DOL's relevant substantive additions italicized as follows:

(c) . . . [A]gricultural labor as defined and applied in [§] 3121(g) of the Internal Revenue Code of 1986 at 26 U.S.C. 3121(g); agriculture as defined and applied in [§] 3(f) of the Fair Labor Standards Act of 1938 (FLSA) at 29 U.S.C. 203(f); . . . *or logging employment. An occupation included in either statutory definition is agricultural labor or services, notwithstanding the exclusion of that occupation from the other statutory definition. For informational purposes, the statutory provisions are listed below.*

*(1)(i) Agricultural labor for the purpose of paragraph (c) of this section means all service performed:*

\* \* \*

*(A) On a farm, in the employ of any person, in connection with cultivating the soil, or in connection with raising or harvesting any agricultural or horticultural commodity, including the raising, shearing, feeding, caring for, training, and management of livestock, bees, poultry, and fur-bearing animals and wildlife . . . .*

\* \* \*

*(B) In the employ of the owner or tenant or other operator of a farm, in connection with the operation, management, conservation, improvement, or maintenance of such farm and its tools and equipment . . . .*

20 C.F.R. § 655.103(c)(1)(i) (emphasis added); *see also Everglades Harvesting & Hauling, Inc. v. Scalia*, 427 F. Supp. 3d 101, 104-05 (D.D.C. 2019).

Thus, the question of whether an immigrant under the INA is to utilize the H-2A as opposed to the H-2B program depends upon, in pertinent part, classification of the anticipated labor as "agricultural" under either § 3121(g) of the Internal Revenue Code ("IRC"), *or* § 203(f) of the FLSA.

Section 3121(g) of the IRC encompasses within "agricultural labor" all service performed:

> on a farm, in the employ of any person, in connection with . . . the raising, shearing, feeding, caring for, training, and management of livestock, . . . animals and wildlife," and "in the employ of the owner or tenant or other operator of a farm, in connection with the operation, management, conservation, improvement, or maintenance of such farm and its tools and equipment.

26 U.S.C. § 3121(g)(1)–(2).

The DOL has not yet adopted its own regulations further elaborating on the definition of IRC § 3121(g)(1)–(2). *See Everglades*, 427 F. Supp. 3d at 105. However, the Department of the Treasury has promulgated its own regulations providing clarification:

> (b) Services described in [S]ection 3121(g)(1). (1) Services performed on a farm by an employee of any person in connection with any of the following activities constitute agricultural labor:
>
> * * *
>
> (ii) The raising, shearing, feeding, caring for, training, or management of livestock, bees, poultry, fur-bearing animals, or wildlife; . . .
>
> * * *
>
> (c) Services described in [S]ection 3121(g)(2). (1) The following services performed by an employee in the employ of the owner or tenant or other operator of one or more farms constitute agricultural labor, provided the major part of such services is performed on a farm:

> (i) Services performed in connection with the operation, management, conservation, improvement, or maintenance of any of such farms or its tools or equipment; or
>
>                              \* \* \*
>
> (2) The services described in paragraph (c)(1)(i) of this section may include, for example, services performed by . . . ***mechanics***, farm supervisors, . . . and other skilled or semiskilled workers, which contribute in any way to the conduct of the farm or farms, as such, operated by the person employing them, as distinguished from any other enterprise in which such person may be engaged.

26 C.F.R. § 31.3121(g)-1 (emphasis added).

       Here, the parties make but tangential references to the IRC's definition, and focus their briefs upon the FLSA's definition and the cases interpreting it in the context of the agricultural exemption. (Docs. 152 at 15; 169 at 19). The FLSA's definition appears on its face to be broader than the IRC's definition under § 3121(g). Further, there is an ostensible absence of case law interpreting § 3121(g)'s scope. Given this, and because the DOL regulations allow for employment fitting either circumscription to dictate the H-2 branch an applicant is to follow, the Court will refer to the FLSA interpretations only in its analysis.

       1.    "Agricultural" Under the FLSA's Exemptions

       Under the FLSA, § 3(f) (codified as § 203(f))[2] defines the Byzantine term "agriculture" as including:

> farming in all its branches and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities . . . performed by a farmer or on a farm ***as incident to or in conjunction with such farming operations*** . . . .

29 U.S.C. § 203(f) (emphasis added). As reproduced above, the DOL has integrated verbatim the quoted language from § 203(f) in its regulatory definition, with no additions or alterations.

---

[2] For the sake of clarity, and because the INA and the DOL regulations refer to it as such, "§ 203(f)" will refer to § 3(f) of the FLSA throughout the remainder of this Order.

*See* 20 C.F.R. § 655.103(c)(2); 29 C.F.R. § 780.105(b)–(c) (incorporating relevant case law on § 3(f)).

The Supreme Court of the United States as well as the United States Court of Appeals for the Fifth Circuit have distinguished between the two aspects of "agriculture," which include "farming in both a primary and secondary sense." *Sanderson Farms, Inc. v. NLRB*, 335 F.3d 445, 449 (5th Cir. 2003) (citing *Bayside Enters., Inc. v. NLRB*, 429 U.S. 298, 300 (1977)). "Primary farming" encompasses the initial list of enumerated occupations in § 203(f), while "secondary farming" is markedly more inclusive, referring to the second clause of § 203(f) concerning "practices . . . performed . . . as incident to or in conjunction with . . . farming operations," quoted and emphasized above. *See Holly Farms Corp. v. NLRB*, 517 U.S. 392, 398 (1996); *see also* 29 U.S.C. § 203(f). While "[a]n employer's business may include both agricultural and nonagricultural activities," those employees employed solely in the nonagricultural portion of the business are not classified as "agricultural." *Bayside Enters., Inc. v. NLRB*, 429 U.S. 298, 301 (1977); *see also* 29 C.F.R. § 780.105(d) ("Employment not within the scope of either the primary or the secondary meaning of 'agriculture' as defined in [S]ection 3(f) is not employment in agriculture."). Thus, even if an employer's business may in some respects entail nonagricultural processes, the inquiry is contingent upon the character of the employee's own labor.

"Secondary farming," sometimes referred to as "secondary agriculture," is unlike "primary farming," which has a clearer and narrower definition. *Sanderson Farms*, 335 F.3d at 449. In the absence of a precise definition for "agriculture," "secondary farming" or "secondary agriculture" invite an analysis wherein the Court must determine whether the activities concerned were "carried on as part of the agricultural function or [were] so separately organized

and conducted as to be treated as an independent nonagricultural productive function." *Reich v. Tiller Helicopter Servs.*, 8 F.3d 1018, 1026 (5th Cir. 1993) (citing *Farmers Reservoir & Irrigation Co. v. McComb*, 337 U.S. 755, 760–63 (1949)).  DOL regulations further provide that the inquiry is necessarily fact-intensive, as "[t]he line between practices that are and those that are not performed 'as an incident to or in conjunction with' . . . farming operations is not susceptible of precise definition."  29 C.F.R. § 780.144; *see also Bills v. Cactus Fam. Farms, LLC*, 5 F.4th 844, 847 (8th Cir. 2021) (citing 29 C.F.R. §§ 780.144–780.145).

Regardless, the DOL regulations provide some guidance, portending that an activity would be secondary agriculture "if it constitutes an established part of agriculture, is subordinate to the farming operations involved, and does not amount to an independent business."  29 C.F.R. § 780.144.  Whether a practice is an "established" part of agriculture depends, in part, on whether "performance of the practice is in such competition with agricultural or with industrial operations, and . . . the extent to which such a practice is ordinarily performed by farmers incidentally to their farming operations," all adjudged by the "common understanding of what is agricultural and what is not."  29 C.F.R. § 780.146.

Here, it is undisputed that the Venegas operation included some sheep shearing, which indubitably would fall within the "secondary farming" definition of "agricultural."  (Docs. 152-8 at 21:7–11; 152-9 at 45:1–5); *see* 29 C.F.R. § 780.158.  Mechanic work on vehicles, on the other hand, separate from any purpose for which the vehicles would be utilized, certainly would not constitute "agricultural" work under "primary farming," as it is not one of or similar to the examples enumerated in § 203(f).  The sort of tasks the evidence indicates Plaintiff performed are described in § 780.158 of the DOL regulations, which states in pertinent part:

Employees of a farmer who repair the mechanical implements used in farming, as a subordinate and necessary task incident to their employer's farming operations, are within [S]ection 3(f).

* * *

Only employees engaged in the repair of equipment used in performing *agricultural functions* would be within [S]ection 3(f), however; employees repairing equipment used by the employer in *industrial or other nonfarming activities* would be outside the scope of agriculture.

29 C.F.R. § 780.158 (citing *Maneja v. Waialua Agric. Co.*, 349 U.S. 254 (1955)) (emphasis added).

Thus, maintaining the vehicles used in the upkeep of sheep shearing, or even fencing on a farm, could be considered incidental to agricultural services performed under Venegas if Venegas was so engaged.  *See also Chhum v. Anstett*, 2016 WL 4203389, at *3 (D. Conn. Aug. 9, 2016) ("Courts have recognized examples of . . . secondary agricultural activities to include[] . . . "the repair and servicing of equipment necessary to farm operations[.]") (citing *Maneja*, 349 U.S. at 260–64).  As such, the main question to be resolved is whether Plaintiff's work overall was a "secondary farming" activity, or was instead separate from any "agricultural function" Venegas's business performed.

In other words, the Court is faced at this juncture with the issue of whether said labor constituted "secondary farming," and therefore agricultural labor, under the DOL regulations. *Sanderson Farms, Inc. v. NLRB*, 335 F.3d 445, 449 (5th Cir. 2003) (citing *Bayside Enters. v. NLRB*, 429 U.S. 298, 300–01 (1976))).  To answer this question under § 780.158, a sub-inquiry must be made into the agricultural or nonagricultural nature of Venegas's fencing business.  The Court, observant of the aforementioned statutory and regulatory enumerations, summarizes the standard for "secondary farming" as "any practices, whether or not themselves farming practices, which are performed . . . on a farm as an incident to or in conjunction with 'such' farming

21

operations." *Tullous v. Tex. Aquaculture Processing Co. LLC*, 579 F. Supp. 2d 811, 817–18 (S.D. Tex. 2008) (citing *Farmers Reservoir*, 337 U.S. at 762–63); *see also* 29 C.F.R. § 780.144.

    2.    "On a Farm"

        The question of whether Plaintiff engaged in secondary agricultural activities thus "turns on the same considerations as it would for any other worker—was his work performed on a farm, and was it incidental to or in conjunction with [a] farm's farming operations?" *See Vanegas v. Signet Builders, Inc.*, 554 F. Supp. 3d 987, 990 (W.D. Wis. 2021); *see also Reich v. Tiller Helicopter Servs.*, 8 F.3d 1018, 1026 (5th Cir. 1993). The term "farm" as defined by the DOL "includes stock, dairy, poultry, fruit, fur-bearing animal, and truck *farms*, plantations, *ranches*, nurseries, ranges, greenhouses or other similar structures used primarily for the raising of agricultural or horticultural commodities, and orchards." 20 C.F.R. § 655.103(c)(ii) (emphasis added). The parties in the present suit disagree as to whether Plaintiff's labor was performed on ranches or farms, whether it be Venegas's or those of third parties. (*See* Docs. 153 at 12; 162 at 5–6). For labor to be classified as secondary farming, it must have been "performed by a farmer or on a farm and it had to be incidental to the farming operations performed either by the farmer for whom it was done or on the farm where it was done." *Tiller Helicopter*, 8 F.3d at 1027 (citing *Maneja*, 349 U.S. at 262–63). It follows that "[a]ny practice which cannot be performed on a farm . . . is necessarily excluded . . . when performed by someone other than a farmer." 29 C.F.R. § 780.134; *see also id.* § 780.129 (practices "must also be performed either in connection with the farmer's own farming operations or in connection with farming operations conducted on the farm").

        The parties have introduced evidence which leaves unclear the question of the nature of the land on which Plaintiff's work took place. For example, Plaintiff testified that his work was

performed at the "yard," a place he characterized as Venegas's "compound."  (Doc. 153-19 ¶ 4, 6).  Venegas's own declarations indicate this is in fact not a compound, but that the facility is based on Venegas's ranch.  (Doc. 152-2 ¶ 5).  Neither party disputes whether at least a majority of Plaintiff's practices were performed at the "shop" or the "yard" on Venegas's property.  The fog warning arises from, expectedly, the open question of the status of the "shop" or "yard" as a ranch, or instead another type of property which would cast it outside the scope of "farm" under the statute.  That Venegas hosts "zebras, llamas," and several types of traditional livestock on the site is not necessarily dispositive of the issue, and is certainly insufficient to persuade the Court in his favor.  (Doc. 152-10 at 58:3–12).  In that same vein, Plaintiff's declaration that Venegas's "yard" was a "compound" and *not* itself a "ranch" evidently produces a dispute upon which a reasonable juror could find for either party.  Paddling this ocean, therefore, is best relegated to the factfinder at trial.  (Docs. 152-2 ¶ 5; 153-19 ¶ 5); *see also Jimenez v. Duran*, 287 F. Supp. 2d 979, 989 (N.D. Iowa 2003) (finding the "farm" quality to not be disputed); *Bills v. Cactus Fam. Farms, LLC*, 5 F.4th 844, 847 (8th Cir. 2021) (same).

Therefore, the Court concludes that there exists a genuine dispute of material fact concerning the nature of the property on which the "shop" or "yard" is located.  In particular, while the parties agree that the land on which the "shop" sat was owned by Venegas or affiliates at all relevant times, it is heavily disputed whether the land was a "ranch" or otherwise a "farm" under the DOL regulations.  Accordingly, Plaintiff's Motion for Partial Summary Judgment and FVS and Venegas's Motions for Final Summary Judgment are **DENIED**.  (Docs. 151, 152, 153).

3.    "Incident to or in Conjunction With"

23

Assuming the work at the shop was at a farm,[3] the next point of inquiry is "whether the . . . employee's activities are inevitably 'incident to or in conjunction with' the farming operation."[4]  *Camargo v. Trammell Crow Int. Co.*, 318 F. Supp. 2d 443, 447 (E.D. Tex. 2004) (quoting *Holly Farms Corp. v. NLRB*, 517 U.S. 392, 401–04 (1996)).  As set forth above, the evidence demonstrates Plaintiff's work almost entirely consisted of maintaining vehicles and other equipment located on Venegas's property.  (Doc. 153-19 ¶ 3, 6) (Plaintiff recalling his job as entailing the regular maintenance and minor repairs on equipment and vehicles).  Plaintiff's maintenance work falls into two principal categories: (1) related to sheep shearing equipment, and (2) in support of Venegas's fencing operations.  Regarding the former, Plaintiff undisputedly "did not directly shear sheep or assist" in sheep shearing, but instead performed maintenance activities on the equipment and vehicles used in Venegas's sheep shearing operations.  (Doc. 153-5 at 44:9–11, 45:1–21).  Specifically, Plaintiff's employment consisted of "repair[ing] and maintain[ing] many different kinds of trucks, trailers, buses, bulldozers, skid steers, generators,

---

[3] Even if it could be said that the worksite of Plaintiff's work was not a ranch or "farm" as defined by § 655.103(c), the mere fact that the tasks performed were "not performed 'on a farm'" for the purpose of analyzing the agricultural nature of Plaintiff's employment is not dispositive.  *See Tiller Helicopter*, 8 F.3d at 1028.  Likewise, "a minor and incidental part of the work . . . occur[ring] off the farm will not affect [the Court's] conclusion."  29 C.F.R. § 780.136.  In fact, other DOL regulations contemplate the possibility that even off-farm shop employees who service and maintain farmers' equipment could come within "secondary agriculture" or "farming."  *See id.* § 780.129 (describing the above as only "*generally* [not] com[ing] within the secondary meaning") (emphasis added).

[4] The parties dispute the aptness of the Fifth Circuit's decision in *Reich v. Tiller Helicopter Services*. 8 F.3d 1018 (5th Cir. 1993).  Defendants characterize the case of *Tiller Helicopter* as "dispositive in this case in favor of Defendants." (Doc. 162 at 9).  This is not so.  There, the Fifth Circuit determined that, because the Tiller Helicopter employees "performed a function that had 'significance and purpose only in making it possible for the harvesting activity to take place' and that terminated on the farms of the client farmers," they would be subject to the exemption.  *Tiller Helicopter*, 8 F.3d at 1029–30 (quoting *Wirtz v. Osceola Farms Co.*, 372 F.2d 584, 589 n.4 (5th Cir. 1967)).  The Fifth Circuit, however, was answering the question of whether the employees, who performed work neither for a farmer *nor on a farm*, as secondary agricultural activities typically require, could still be found exempt under the agricultural exemption as performing a secondary agricultural task.  *Id.* at 1028–29.  Although the Fifth Circuit's recitation of the meaning of "incidental to" under § 203(f) is correct, *Tiller Helicopter* is not necessarily dispositive here because there is, as set forth elsewhere in this Order, a genuine dispute of fact concerning the purpose of Venegas's fencing operations.  *See id.* at 1028.  Thus, it is yet to be determined whether Plaintiff's upkeep and mechanic work on the fencing equipment and tools—which would by extension be necessary to maintain Venegas's fencing operations— was conducted in support of *any* primary or secondary agricultural task.

welding equipment, air compressors, air hammers, hydraulic hammers, saws, and shop equipment like a forklift." (Docs. 151-10 at 55:18–21; 153-19 ¶ 3).

Venegas has conceded that Plaintiff's duties included the repair of vehicles and machinery for the shearing operation. (Docs. 152 at 4; 152-2 ¶ 5). The Court observes that the maintenance services in support of sheep shearing, if such indeed occurred on a farm and were Plaintiff's sole duty as part of his employment with Defendants, would be agricultural under the DOL regulations. Although Plaintiff himself did not shear sheep, his activities in repairing the "heavy" and other farm equipment necessary for the other employees to do so invites the conclusion that Plaintiff engaged in secondary farming. (Doc. 153-11 at 10); *see also Farmers Reservoir*, 337 U.S. at 763–64 (observing that a company's conduct in support of primary farming may constitute "farming" nonetheless under § 203(f)). Plaintiff has failed to sufficiently demonstrate to the Court that his activities in support of Venegas's sheep shearing were not "incident to or in conjunction with [Venegas's] farming operations." 29 U.S.C. § 203(f).

The question of whether Plaintiff's work overall, however, was performed in support of an allegedly nonagricultural fencing operation is a disputed material fact. While Plaintiff estimates that the share of time he spent repairing and maintaining Venegas's shearing equipment was "less than 5% of [his] worktime" due to the relatively "small amount of machinery" involved, Venegas has cited no authority and made no argument that, even though the majority of his working time was spent maintaining equipment for the fencing business, the fencing maintenance work is imbued with the agricultural characteristic of the shearing activities. (Doc. 153-19 ¶ 5). In fact, Venegas's argument here, in effect, is that work involving practices which support any DOL-deemed secondary farming operation, such as maintaining the equipment used for sheep shearing, constitute secondary farming despite a majority of the

employee's other activities being potentially nonagricultural if they were instead performed independently as the employee's sole responsibility.   This, as will be explained below, controverts settled and existing case law concerning the DOL regulations and § 203(f)'s expounding of the definition of "agriculture" as a function of a worker's entire vocational experience, and Venegas has not provided a sufficient reason to diverge from it.

Consequently, the Court concludes that Plaintiff's maintenance services in support of Venegas's fencing operations present a genuine dispute of material fact.   Plaintiff's maintenance and/or mechanic employment consisted of a splintered nature—one aspect geared towards sheep shearing, and another towards fencing.   As the vast majority of Plaintiff's duties, the maintenance in support of Venegas's fencing business cannot be severed and must be considered holistically, notwithstanding the arguably secondary agricultural quality of the maintenance work on Venegas's shearing equipment.   *See, e.g.*, *Marshall v. Gulf & W. Indus., Inc.*, 552 F.2d 124, 126 (5th Cir. 1977) ("If employees are engaged both in exempt and non-exempt work, the [FLSA] applies to the entirety.") (citing *Skipper v. Superior Dairies, Inc.*, 512 F.2d 409, 411 (5th Cir. 1975)).   "Fencing," on its own, even if it occurs on a farm, is not one of the delineated examples in § 203(f) of the FLSA, and is therefore not "primary farming."   *See* 29 U.S.C. § 203(f); *Holly Farms*, 517 U.S. at 399–400.   If Plaintiff's causes of action for RICO visa fraud, FLSA overtime pay and immigration fraud, and breach of contract and/or quantum meruit are to succeed, Plaintiff must demonstrate at trial that the maintenance he performed on the vehicles and equipment used in support of Venegas's fencing business was nonagricultural.   Since the fencing tasks are unequivocally not primary farming, Defendants hold the burden of showing Plaintiff's activities were "secondary farming."

Pursuant to the DOL regulations, "[p]ractices performed on a farm in connection with nonfarming operations performed on or off such farm do not meet the [secondary agriculture] requirement." 29 C.F.R. § 780.142. Thus, courts, at the "secondary farming" prong, where they have become disjointed in determining the nature of the employee's work, look to the purpose of the work performed. *Signet Builders*, 554 F. Supp. 3d at 990–91 (finding employee's work to be secondary agriculture because he "worked with materials used directly for an agricultural purpose: confining livestock"); *see also* 29 C.F.R. § 780.142 ("Whether or not some practices are performed in connection with farming operations conducted on the farm where they are performed must be determined with reference to the *purpose* of the farmer for whom the practice is performed.") (emphasis added).

Thus, Venegas's own status as a farmer, if Plaintiff was tasked with performing nonagricultural activities, would not end the inquiry, and is not considered here. FVS does assert in its briefings that Venegas's fencing services are provided "exclusively for farms and ranches for the management and enclosure of livestock." (Doc. 151 at 2). The evidence to which FVS points in support of this proposition, while contextually hinting at the location of fencing being farms and ranches, does not signify the *purpose* for which the fences were erected. (*See* Doc. 152-8 at 20–22). Thus, while Defendants' claimed purpose of Plaintiff's labor, being the enclosure of livestock, would certainly be agricultural, thereby classifying it as secondary agriculture, FVS and Venegas have not presented enough conclusive evidence on this characterization. *Signet Builders*, 554 F. Supp. 3d at 990.

Plaintiff argues that, because most of Venegas's *business* is dedicated to fencing, which Plaintiff implicitly contends is nonagricultural in nature, his employment as a fencing equipment mechanic therefore is also nonagricultural. (Doc. 153 at 18). This reading of the FLSA, INA,

and DOL regulations is incorrect.   Neither § 203(f) nor the DOL regulations hinge the agricultural analysis upon whether the *employer's* business generally is nonagricultural; rather, the significant characteristic is "whether the *worker's* activities are directed toward an agricultural or nonagricultural end." *Signet Builders*, 554 F. Supp. 3d at 991 (emphasis in original) (citing *Maneja v. Waialua Agric. Co.*, 349 U.S. 254 (1955)).   Additionally, DOL regulations themselves contemplate "practice[s] performed" by the employee, and not of the employer. *See, e.g.*, 29 C.F.R. § 780.144.  Plaintiff's arguments therefore be rejected.

Plaintiff advances the additional contention that Venegas's fencing operation is an "independent productive activity," thereby separating it from any agricultural purpose which may otherwise be served.   (Doc. 153 at 8–12).   Resolution of this dilemma hinges on the independence of the FVS organization's maintenance practices from the fencing activities it purportedly conducts.   *See Farmers Reservoir*, 337 U.S. at 761–62, 768.   In this instance, however, the evidence is undisputed in that FVS is solely owned by Venegas, and FVS's and Venegas's employees themselves perform the sheep shearing and fencing services of which Plaintiff's labor is in support.   (Docs. 153-11 at 7, 10; 153-10 at 8).   The shearing-fencing business is thus not a separate organization from the entity which employs Plaintiff to perform maintenance on its vehicles and equipment.   (Doc. 151-5).   Further, to Plaintiff's chagrin, unlike the employer in *In re MRL Fencing and Construction*, which admitted during its ALJ hearings that its "fulltime construction workers are not ranch hands or farm workers," Defendants' employees were indeed themselves engaged in shearing sheep and repairing and building fences. *In re MRL Fencing & Constr.*, No. 2012-TLN-00042, ALJ's Decision and Order Reversing Denial of Certification (Dep't of Labor Aug. 8, 2012), at 2–3; (Doc. 153 at 12).   *MRL Fencing* as such is not illustrative. *See Signet Builders*, 554 F. Supp. 3d at 992–93.  Therefore, regardless of

whether Venegas's fencing operations could be construed as a form of secondary agriculture, the shearing-fencing business is unquestionably not an independent activity from the maintenance work performed in support thereof. *See Tullous*, 579 F. Supp. 2d at 818–19. This argument must also be rejected.

As mentioned, fencing constructed for the purpose of enclosing livestock is indeed an agricultural activity. *Signet Builders*, 554 F. Supp. 3d at 990–91. Because it is uncontroverted that Plaintiff himself never laid any fence, the fencing operation would therefore only be distinguishable from Plaintiff's maintenance work if Venegas and FVS lacked independence in decision-making over Plaintiff from those individuals who actually laid the fences. *Gulf & W.*, 552 F.2d at 126. Plaintiff at all times was employed subordinate to Defendants, and neither party asserts that the farmers for whom the shearing and fencing work was performed controlled Plaintiff's duties.

The Court is aware that fences can be utilized, even on ranches and farms, for the enclosure of livestock, which surely would constitute secondary farming in support of the primary farming and cultivation of livestock. 29 C.F.R. § 780.128; *see Signet Builders*, 554 F. Supp. 3d at 990–91. At the same time, fences can conceptually be installed on such landscapes for nonagricultural purposes, such as delineating property boundaries, identifying hazards, or securing one's residence. *See* 29 C.F.R. § 780.142 (theorizing multiple agricultural and nonagricultural purposes, for such operations as "land clearing"); (*see also* Doc. 153 at 9–10). The evidence before the Court as presented establishes a genuine dispute of material fact as to whether the maintenance Plaintiff performed, as between both the machinery and equipment used in support of sheep shearing as well as for installing and replacing fences, was conducted in support of agricultural operations.

The DOL has interpreted "maintenance and protective work" to generally count as secondary agriculture, provided that such work is done incident to or in conjunction with other agricultural (primary *or* secondary) farming practices.  *See* 29 C.F.R. § 780.158.  In sum, the question of whether the majority of the maintenance tasks—i.e., those which were undertaken for Venegas's fencing business—supported fencing as secondary agriculture has not been decisively answered.  *See Diaz v. Neff & Son, Inc.*, No. JKB-15-0337, 2015 WL 5032665, at *5 (D. Md. Aug. 25, 2015) (noting that the analysis "is one based upon facts and circumstances").  Accordingly, Plaintiff's Motion for Partial Summary Judgment is **DENIED** as to whether his labor in support of Venegas's fencing-and-sheep-shearing operations constituted nonagricultural labor or instead "secondary farming" under § 203(f) of the FLSA.  (Doc. 153).  Likewise, Venegas's and FVS's Motions for Final Summary Judgment are **DENIED** as to whether Plaintiff's maintenance repair work on the equipment and vehicles used in connection with Defendants' "fencing and shearing operation" was agricultural.  (Docs. 151, 152).

**F.     Statutes of Limitation**

    1.     RICO

Venegas moves for summary judgment on the basis that Plaintiff's claims under RICO are barred entirely by the statute of limitations.  (Doc. 152).  Under Fifth Circuit and Supreme Court precedent, "[c]ivil RICO claims have a four-year statute of limitations." *Joseph v. Bach & Wasserman, L.L.C.*, 487 F. App'x 173, 176 (5th Cir. 2012) (unpublished) (citing *Rotella v. Wood*, 528 U.S. 549, 552 (2000)); *see also* 18 U.S.C. §§ 1962(c)–(d), 1964(c).  The four-year statute of limitations follows the "injury discovery" rule, which calculates accrual only starting when "a plaintiff discovers, or though reasonably diligent investigation should discover, the injury." *Petrobras Am., Inc. v. Samsung Heavy Indus. Co.*, 9 F.4th 247, 253 (5th Cir. 2021);

*Rotella*, 528 U.S. at 553–54.   "[W]hen RICO claims potentially involve a series of separate injuries," it is well-established that the Fifth Circuit applies a "separate accrual" rule as well. *Jaso v. Coca Cola Co.*, 435 F. App'x 346, 354–55 (5th Cir. 2011) (unpublished); *Love v. Nat'l Med. Enters.*, 230 F.3d 765, 774–75 (5th Cir. 2000).   The separate accrual rule, in tandem with the injury discovery rule, creates a civil RICO cause of action "for *each* injury when the plaintiff discovers, or should have discovered, that injury."  *Love*, 230 F.3d at 773 (emphasis added).

Contrary to Venegas's characterization, the synthesis between the separate accrual rule and the injury discovery rule denotes Plaintiff's claims as accruing only after Plaintiff "knew, or should have known, that [he] *suffered an injury* caused by th[e] allegedly fraudulent conduct." *Lewis v. La. State Univ.*, No. 21-198-SM-RLB, 2021 WL 5752239, at *25 (M.D. La. Dec. 2, 2021) (citing *Love*, 230 F.3d at 777) (emphasis added) (rejecting the notion that the accrual begins upon the plaintiff's awareness of the fraud, as opposed to the injury caused thereby). Whether a plaintiff has discovered, or should discover through reasonably diligent investigation, the injury allegedly suffered, is a question of fact.  *Petrobras Am.*, 9 F.4th at 256 (acknowledging that the defendant's arguments "at best raise fact questions"); *see also Senigaur v. Ford Motor Co.*, 222 F. Supp. 2d 829, 832 (E.D. Tex. 2002).

Here, the parties dispute the moment Plaintiff should have or did discover his claimed injuries.  (Docs. 152 at 3–4; 170 at 21).  Thus, there exists a question of when Plaintiff should have discovered the injuries he claims he has suffered, which would begin the clock for the four-year statute of limitations.  As the last injury asserted in Plaintiff's Second Amended Complaint occurred in 2017, under the applicable statute of limitations, at least some of Plaintiff's injuries could still accompany a valid claim under RICO depending upon when Plaintiff could have discovered the injuries.  (Doc. 47 at 12–16).  Because a genuine issue of material fact exists as to

the date of Plaintiff's discovery of his injuries, and therefore Venegas's entitlement to the affirmative defense of the statute of limitations, Venegas's Motion for Final Summary Judgment is **DENIED** on this ground.  (Doc. 152).

2.    FLSA

FVS moves for summary judgment on the basis that Plaintiff's claims under the FLSA are barred, in part, by the statute of limitations.  (Doc. 151).  Claims under the FLSA are normally subject to a two-year statute of limitations, which may be extended one year for willful violations.  29 U.S.C. § 255(a); *McLaughlin v. Richland Shoe Co*., 486 U.S. 128, 135 (1988).  A violation of the FLSA is willful if an employer "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute."  *McLaughlin*, 486 U.S. at 133.  The DOL's regulations explain that "an employer's conduct shall be deemed to be in reckless disregard of the requirements of the [FLSA], among other situations, if the employer should have inquired further into whether its conduct was in compliance with the [FLSA], and failed to make adequate further inquiry."  29 C.F.R. § 578.3(c)(3).

However, the question of willfulness is not an appropriate issue for summary judgment based on the record before the Court.  Because a genuine issue of material fact exists as to FVS's affirmative defense of the statute of limitations, FVS's Motion for Final Summary Judgment is **DENIED**.  (Doc. 151).

## G.    RICO-Specific Claims

Venegas moves for summary judgment on Plaintiff's RICO claims on several grounds. Two of those grounds relate to Plaintiff's RICO claims for Venegas's participation in the alleged scheme as well as a RICO conspiracy under 18 U.S.C. § 1962(c), (d).  (Doc. 152).  To assert a claim for a violation of RICO, a plaintiff must establish the presence of three threshold elements:

"(1) a person who engages in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise." *Earl v. Boeing Co.*, 339 F.R.D. 391, 425 (E.D. Tex. 2021) (citing *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 523–24 (5th Cir. 2016)).  Section 1962(c) proscribes "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate . . . commerce, [from] conduct[ing] or participat[ing], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." *Waste Mgmt. of La., L.L.C. v. River Birch, Inc.*, 920 F.2d 958, 965 (5th Cir. 2019).  A conspiracy to commit a RICO violation under § 1962(d) requires a plaintiff to demonstrate "(1) that two or more people agreed to commit a substantive RICO offense and (2) that [the defendants] knew of and agreed to the overall objective of the RICO offense." *N. Cypress Med. Ctr. Operating Co., Ltd. v. Cigna Healthcare*, 781 F.3d 182, 203 (5th Cir. 2015) (alteration in original).

An act of "racketeering activity," also described as a "predicate act," includes any act listed in 18 U.S.C. § 1961.  *See Zastrow v. Hous. Auto Imps. Greenway Ltd.*, 789 F.3d 553, 559 (5th Cir. 2015).  Plaintiff has alleged Venegas has committed several predicate acts relating to purported immigration and visa fraud under 8 U.S.C. § 1324 and 18 U.S.C. §§ 1351, 1546. (Doc. 47 at 27).  Each of these statutes is contained in the enumerated list under 18 U.S.C. § 1961.  *See generally* 18 U.S.C. § 1961.  As discussed above, there is a genuine dispute of fact as to whether Plaintiff's labor was "agricultural" under the DOL regulations, and thus, whether Defendants committed any fraud.  Accordingly, at this time, summary judgment in favor of Venegas as to Plaintiff's RICO claims is improper.

Venegas also moves for summary judgment in part on the ground that he is entitled to the affirmative defense of *in pari delicto*.  (Doc. 152 at 6).  The *in pari delicto* defense "derives from

the Latin, *in pari delicto potior est conditio defendentis*: 'In case of equal or mutual fault . . . the position of the [defending] party . . . is the better one.'" *Rogers v. McDorman*, 521 F.3d 381, 385 (5th Cir. 2008) (alterations in original) (quoting *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306 (1985)); *see also In Pari Delicto*, *Black's Law Dictionary* (10th ed. 2014).   The principle embodies "the common-law notion that a plaintiff's recovery may be barred by his own wrongful conduct."   *Pinter v. Dahl*, 486 U.S. 622, 632 (1988). Plaintiff counters the assertion that Venegas can prove the *in pari delicto* defense, instead arguing that Venegas, being the mastermind of the operation and having fifty-three (53) times greater fault than Plaintiff himself, would be unable to assume application of the defense at this stage.   (Doc. 170 at 21–22).

As the Court has explained above,[5] whether the work Plaintiff performed constituted "agricultural labor" under the DOL regulations is determinative of the vast majority of Plaintiff's federal claims.   The Court has concluded that there exists a genuine dispute of material fact as to this determination.   The *in pari delicto* defense cannot be evaluated where there is a dispute of fact as to whether the party asserting the defense committed any wrongdoing.   *See In re TOCFHBI, Inc.*, 413 B.R. 523, 537 (Bankr. N.D. Tex. 2009) ("[E]ven if the *in pari delicto* doctrine is available to use . . . , it is not a basis to grant summary judgment . . . in the case at bar, because such defense is intensely factual and there are genuine issues of disputed fact relevant to this defense."); *see also In re Vantage Benefits Adm'rs*, 2021 WL 1815065, at *14 (Bankr. N.D. Tex. May 5, 2021) (recalling *TOCFHBI* as involving a "determin[ation that] it was too factually

---

[5] Venegas also moves for summary judgment for Plaintiff's RICO claims generally, maintaining that, as to the substantive allegations, because Plaintiff's labor was "agricultural," there is no visa fraud, and therefore his claims must fail.   (Doc. 152 at 14–17).   Plaintiff does not move for summary judgment as to his RICO claims, but does insist that the Court determine that his labor was indeed "agricultural" under the INA and DOL regulations.   (*See generally* Doc. 153).   Because there is a factual dispute as to whether the activities Plaintiff performed were "agricultural," and therefore may signify some fraud by Venegas, the Court cannot adjudicate Plaintiff's RICO claims at this time.

intensive of an inquiry to conduct even at summary judgment").  Venegas has therefore failed to meet his burden of demonstrating that there exists a genuine issue of material fact as to Plaintiff's RICO claims, or an entitlement to the *in pari delicto* affirmative defense. Accordingly, the Court **DENIES** in part Venegas's Motion for Final Summary Judgment on this ground.  (Doc. 150).

## H.    FLSA-Specific Claims

The Second Amended Complaint presents claims against FVS for in part alleged violations of the FLSA.  FVS move for summary judgment on the grounds that Plaintiff is not entitled to overtime pay because he is employed in agriculture.  (Doc. 151).  FVS also moves for summary judgment on the basis that Plaintiff lacks standing to complain about his DOL-approved rate of pay.

Plaintiff argues that his work was not "agricultural" within the meaning of the FLSA. (Doc. 153 at 1).  As noted above, Plaintiff asks the Court to determine whether his work constituted "agriculture" under the FLSA, and therefore exempt from the FLSA's overtime pay requirement pursuant to 29 U.S.C. §§ 203(f) and 213(b)(13).  (*Id.* at 2).  While the FLSA mandates that employers pay employees who work more than forty hours per week at a rate of 1.5 times their regular hourly rate, it exempts "any employee with respect to his employment in agriculture by a farmer[.]"  29 U.S.C. §§ 207, 213(b)(13).  Briefly, the Supreme Court has recognized that § 203 of the FLSA delineates two branches of agricultural exemptions, primary and secondary.  *Farmers Reservoir & Irrigation Co. v. McComb*, 337 U.S. 755, 762 (1949).  In this case, this Court has already indicated in the preceding discussion that "agriculture" under the FLSA exemptions is the principal lens through which most courts characterize an employee's labor.

Plaintiff argues that "[c]onstructing fences is not primary agriculture." (Doc. 153 at 8). Further, Plaintiff contends that "[f]ence construction is not purely agricultural in nature because landowners erect fences for reasons other than to facilitate 'raising' livestock . . . such as boundary setting, hunting, and excluding animals, people, and vehicles." (*Id*. at 9). Because FVS seeks to claim a FLSA exemption, it ultimately bears the burden of establishing that Plaintiff's labor was exempt. FVS does not argue Plaintiff was engaged in primary agriculture. Accordingly, FVS has failed to meet its burden that Plaintiff's labor constitutes primary agriculture.

For labor to be classified as secondary farming, it must have been (1) "performed by a farmer or on a farm"; (2) "incidental to the farming operations performed either by the farmer for whom it was done or on the farm where it was done," *Reich*, 8 F.3d at 1027 (5th Cir. 1993) (citing *Maneja*, 349 U.S. at 262–63); and (3) "must also be performed either in connection with the farmer's own farming operations or in connection with farming operations conducted on the farm," 29 C.F.R. § 780.129. As the Court has found above, FVS has failed to conclusively demonstrate that Plaintiff's work was performed on a "farm," or that the maintenance he conducted in support of Venegas's fencing business, as the majority of the work performed, was indeed a "farming operation." Therefore, FVS has not established its entitlement to the secondary agriculture exemption as a matter of law.

As explained above, the Court is of the opinion that there are fact issues in this case as to whether Plaintiff's employment for FVS constituted secondary agriculture or farming. FVS bears the burden of proving that the exemption applies. The evidence relied on by the parties to establish this point is conflicting, and the Court is unable to resolve these conflicts at this stage. Thus, there is a genuine issue of material fact as to whether the agricultural exemption applies to

Plaintiff.  Accordingly, FVS's Motion for Final Summary Judgment is **DENIED** (Doc. 151) and Plaintiff's Motion for Partial Summary Judgment is **DENIED**.  (Doc. 153).

## I.      Breach of Contract

Plaintiff sues FVS and Venegas for alleged breach of contract.  Plaintiff claims FVS breached Plaintiff's employment contracts by not paying him the nonagricultural prevailing wage rate for H-2B nonagricultural workers.  (*See* Doc. 47).  FVS moves for summary judgment on the basis that there is no private right of action under federal law for the alleged breach of H-2 employment contracts, and any claim challenging the appropriate certified wage rate in a particular application must be brought against the DOL or Secretary of Labor directly, not against the employer.  (Doc. 151 at 6).  Thus, FVS asserts that Plaintiff lacks standing to bring a breach of contract claim for an incorrect wage rate.  Next, FVS argues Plaintiff's breach of contract claim is preempted by federal statutes.  (*Id.* at 17).  Finally, FVS contends Plaintiff's breach of contract claim fails on the merits.  (*Id.* at 18).

Plaintiff's breach of contract claim is based on H-2A applications submitted by FVS and certified by the DOL in 2015, 2016, and 2017, and contracts signed by Plaintiff arising thereunder.  The DOL certified that the AEWR was the appropriate rate for each of the applicable years, and it is undisputed that FVS paid Plaintiff the AEWR.  Plaintiff nevertheless claims he was entitled to a higher wage rate than the rate certified by the DOL.

### 1.      State Law Standing

FVS also challenges Plaintiff's ability to bring a breach of contract claim under state law.  (*See* Doc. 151).  Per the Court's earlier explications, under the H-2A program, agricultural employers are permitted to hire nonimmigrant aliens as workers if they first obtain from DOL certification that (1) there are insufficient domestic workers who are willing, able, and qualified

to perform the work at the time and place needed; and (2) the employment of aliens will not adversely affect the wages and working conditions of domestic workers.  Pursuant to the DOL's H-2A regulations, the employer wishing to utilize the program must file a clearance order or job order detailing the requirements and conditions of the job for which the employer is seeking foreign workers.  *See* 20 C.F.R. §§ 653.501, 655.121–655.122.  These clearance orders become the employment contract between the employer and the foreign workers.

Here, the summary judgment record shows that Plaintiff had a contract with FVS based on the documentation submitted by FVS to the DOL.  Clearance orders constitute employment contracts that are enforceable under state law.  The Court holds that Plaintiff has standing to bring a state-law breach of contract claim under this Court's supplemental jurisdiction.  *Calixtro-Calixtro v. Estate of Hodges*, No. 1:17-cv-394-LY, 2018 WL 5839690, at *3 (W.D. Tex. Nov. 7, 2018).  Plaintiff may therefore pursue his breach of contract claim against FVS, his alleged employer.  Accordingly, the Court **DENIES** in part FVS's Motion for Final Summary Judgment. (Doc. 151).

### 2.    Preemption

"[T]he FLSA preempts *redundant* state law claims for nonpayment of minimum wages and overtime compensation by way of conflict preemption."  *Aldridge v. Miss. Dep't of Corr.*, 990 F.3d 868, 877 (5th Cir. 2021) (emphasis added).  Whether the FLSA preempts state-law claims "depends on the nature of the state law cause of action and whether there is an equivalent FLSA cause of action . . . . When the FLSA provides a remedial measure, it conflicts with similar state law causes of action and thus preempts them; when the FLSA does not provide a remedial measure, there is no preemption."  *Id*. at 872.

Plaintiff claims he "does not seek to recover minimum wage or overtime damages through his common law claims." (Doc. 169 at 28). Instead, Plaintiff seeks damages for the hourly AEWR or prevailing wage. Plaintiff's separate FLSA claim involves unpaid overtime at the regular rate of pay since the FLSA provides no right to a prevailing wage. Therefore, Plaintiff's common law claims are not redundant of his remedies under the FLSA, and they are not preempted. Accordingly, the Court **DENIES** in part FVS's Motion for Final Summary Judgment. (Doc. 151).

### 3. Merits of Plaintiff's Breach of Contract Claim

After a careful review of the record and the arguments presented, the Court is not convinced that FVS has met its burden of demonstrating there is no genuine issue of material fact on Plaintiff's breach of contract claim. The Court finds there are genuine issues of material fact as to whether FVS paid Plaintiff for all the hours he worked at the hourly wage rate required by the contracts. Accordingly, the Court **DENIES** in part FVS's Motion for Final Summary Judgment. (Doc. 151).

## J. Quantum Meruit

Plaintiff asserts a quasi-contract claim for quantum meruit against FVS in the alternative to recover the prevailing wage rate if FVS's alleged misclassification of work renders the wage term in the H-2A contracts invalid. (*See* Doc. 47). "Quantum meruit is an equitable theory of recovery which is based on an implied agreement to pay for benefits received." *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992). "Recovery in quantum meruit will be had when non payment for the services rendered would result in an unjust enrichment to the party benefitted by the work." *MetroplexCore, L.L.C. v. Parsons Transp., Inc.*, 743 F.3d 964, 975 (5th Cir. 2014).

"To recover under quantum meruit a claimant must prove that: 1) valuable services were rendered or materials furnished; 2) for the person sought to be charged; 3) which services and materials were accepted by the person sought to be charged, used and enjoyed by him; 4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff in performing such services was expecting to be paid by the person sought to be charged." *Vortt Expl. Co. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex. 1990). "In addition, the evidence must show that the efforts were undertaken for the person to be charged and not just that the efforts benefitted that person." *KUV Partners, LLC v. Fares*, No. 02-09-00246-CV, 2011 WL 944453, at \*16 (Tex. App.—Fort Worth, Mar. 17, 2011) (mem. op.) (unpublished); *Encompass Off. Sols., Inc. v. Ingenix, Inc.*, 775 F. Supp. 2d 938, 966 (E.D. Tex. 2011).

FVS argues that Plaintiff's quantum meruit claim is preempted by RICO and the FLSA. (*See* Doc. 151). Alternatively, FVS contends that Plaintiff's quantum meruit claim fails on the merits because Plaintiff was paid pursuant to an express contract. Plaintiff argues that FVS was obligated to pay higher amounts at the prevailing wage as a matter of state law under a quantum meruit theory of liability pursuant to the reasoning of *Mencia v. Allred*, 808 F.3d 463, 471 (10th Cir. 2015). However, the United States Court of Appeals for the Tenth Circuit in *Mencia* did not "address preemption or speculate as to whether [state law] would apply . . . quantum meruit," on the basis that equitable estoppel was not satisfied in that case. *Mencia*, 808 F.3d at 471.

### 1.   Preemption

Plaintiff's quasi-contract claim is not preempted by the FLSA. District courts within the Fifth Circuit have consistently held that:

> where the claim at issue is pled as an alternative cause of action for conduct that is addressed by the FLSA and for which the Act provides a remedy, the common law claim is preempted. On the other hand, where the state law claim affords a

remedy for conduct not otherwise addressed by the FLSA, there is not preemption.

*Newsom v. Carolina Logistics Servs., Inc.*, No. 2:11-cv-172-DCB-JMB, 2012 WL 3886127, at *3 (N.D. Miss. Sep. 6, 2012) (collecting cases). Under the FLSA, therefore, Plaintiff can recover for overtime violations, but not for the failure to pay the AEWR in effect. Thus, to the extent Plaintiff seeks additional wages based on failure to pay the prevailing wage or AEWR, Plaintiff's quantum meruit claim is not preempted. Accordingly, FVS's Motion for Final Summary Judgment is **DENIED** in this regard. (Doc. 151).

### 2. Merits of Plaintiff's Quasi-Contract Claim

Plaintiff's quasi-contract claim turns on legal issues of contract interpretation—namely, whether the wage rate in the contract was invalid. However, no party has moved for summary judgment on construction of the employment contracts. "Quantum meruit is an equitable theory of recovery which is based on an implied agreement to pay for benefits received." *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992). The claim is generally unavailable if a valid contract covers the goods or services a plaintiff furnished. *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 740 (Tex. 2005). Accordingly, this issue is not before the Court and adjudication of this issue is premature.

Plaintiff cites *Zamolla v. Thompson Landscape Servs., Inc*., No. 4:17-CV-00519-ALM-KPJ, 2018 WL 3032677, at *6 (E.D. Tex. May 3, 2018), for the proposition that quantum meruit under Texas law is a proper remedy if a guestworker is unable to enforce the regulatory wage through a contract claim. (Doc. 169 at 30). However, *Zamolla* was decided at the pleading stage, not the summary judgment stage, and the parties there did not contest whether the plaintiff adequately pleaded the elements of a quantum meruit cause of action. Accordingly, this case is inapposite.

While quantum meruit does correct an injustice when a promise to pay is implied, here, FVS's promise to pay Plaintiff was expressly provided in the employment contracts.  Because the parties had an express agreement allocating payments—that is, a contract—the Court will not interject its view of what would constitute an equitable arrangement.  Thus, quantum meruit does not apply in this case.  Allowing Plaintiff to recover more than the contract price for work the contract required would effectively override the parties' agreement.  *Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools, Inc.*, 246 S.W.3d 42, 50 (Tex. 2008) ("[W]hen a valid agreement already addresses the matter, recovery under an equitable theory is generally inconsistent with the express agreement.") (quoting *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000)).

Because all work was performed pursuant to the contracts and the parties' agreement is illustrated by the relevant contracts, Plaintiff cannot recover in quantum meruit.  The work Plaintiff performed was within, and not outside of, the relevant contracts.  It is undisputed that Plaintiff was a party to an express contract with FVS under the H-2A program as a matter of law. As a party to a valid express contract bound by the provisions of that contract, Plaintiff may not bring an action on an implied contract relating to the matter covered by the contract.  Moreover, there is no evidence Plaintiff notified FVS that he was expecting to be paid by FVS at a higher wage than what the contract provided for prior to filing the instant suit.

However, in his Second Amended Complaint, Plaintiff treats quantum meruit as an unjust enrichment theory of recovery: "COUNT III. QUANTUM MERUIT . . . The above-described actions unjustly enriched the Employer Defendants."  (Doc. 47 at 21–22).  The theory of unjust enrichment applies when the defendant has obtained a benefit from another by fraud, duress, or

the taking of an undue advantage.  *See Pope v. Garrett*, 211 S.W.2d 559, 560, 562 (Tex. 1948); *Austin v. Duval*, 735 S.W.2d 647, 649 (Tex. App.—Austin 1987, writ denied).

The Court finds that Plaintiff may proceed to trial on its unjust enrichment theory of recovery to the extent the wage rate in the express contracts with FVS is invalid based on visa and/or immigration fraud.  The Court construes Plaintiff's request to recover in quantum meruit as one instead for unjust enrichment.  Accordingly, FVS's Motion for Final Summary Judgment is **DENIED**.  (Doc. 151).

### K.      Objections to Plaintiff's Summary Judgment Evidence

#### 1.      Deposition Testimony

Defendants object to Plaintiff's Exhibits A and F in their entirety along with all exhibits attached to Plaintiff's Motion for Partial Summary Judgment (Doc. 153) as inadmissible hearsay and deposition testimony from a different case, Cause No. 2:17-CV-54-AM-CW, that cannot be used in the present case.  (Doc. 162-1).  Exhibit A is the deposition of Fermin Venegas, III, taken on January 29, 2020.  Exhibit F is the deposition of Genesis Venegas Salmon, Mr. Venegas's daughter, taken on November 4, 2019.  Defendants object to the admissibility of this evidence under Federal Rule of Civil Procedure 32(8) on the basis that the prior action does not involve the "same subject matter between the same parties, or their representatives or successors in interest."  (Doc. 162-1 at 21); *see also* Fed. R. Civ. P. 32(a)(8).

Plaintiff argues that he adopted his prior testimony in this case pursuant to his admissions and that it may be considered for summary judgment purposes as if it were a sworn affidavit. (Doc. 186 at 12).  Plaintiff contends Ms. Salmon's testimony may also be considered because she testified the testimony was accurate and is likewise appropriate summary judgment evidence akin to an affidavit.

Defendants' objection is misplaced.  Rule 32 governs the use of deposition testimony "[a]t a hearing or trial."  Fed. R. Civ. P. 32(a)(1).  Evidence considered on summary judgment need not be presented in a form actually admissible at trial, and instead must merely be *capable* of being presented in an admissible form.  Fed. R. Civ. P. 56(c)(2).  Plaintiff could readily submit this evidence in an admissible form at trial by, for instance, calling Mr. Venegas or Ms. Salmon as witnesses.  Moreover, many courts have approved the use of sworn testimony on summary judgment, even if that testimony may not satisfy Rule 32(a)(8).[6]  Here, the testimony submitted by Plaintiff was given under oath as part of another matter in the Western District of Texas.  The Court finds the depositions are proper summary judgment evidence.

Defendants also object to Exhibit S in its entirety on the grounds that the testimony is irrelevant and prejudicial under Rules 401, 402, and 403 of the Federal Rules of Evidence, as the testimony relates to issues in a prior case concerning Felix Venegas, an individual with a separate business unrelated to Defendant Venegas.  To the extent the testimony at issue is unrelated to Defendant Venegas, the Court overrules Defendants' objections as moot because "this evidence does not affect the disposition of the summary judgment motion."  *Lilly v. SSC Hous. Sw. Operating Co. LLC*, No. 4:20-CV-03478, 2022 WL 35809, at *3 n.2 (S.D. Tex. Jan. 4, 2022); *Jones v. United Parcel Serv., Inc*., No. 3:06-CV-1535-L, 2008 WL 2627675, at *6 (N.D. Tex. June 30, 2008) (denying objections to summary judgment evidence as moot because the evidence was "not central to the court's conclusions, and sustaining the parties' objections would

---

[6] *Gamble v. FCA US LLC*, 993 F.3d 534, 538 (7th Cir. 2021); *Kelley v. Price-Macemon, Inc.*, 992 F.2d 1408, 1415 n.12 (5th Cir. 1993) ("Although Rule 56 does not expressly contemplate the use of [testimony from a prior trial] in granting summary judgment, we find no error in relying upon such evidence.  It is well-settled that a certified transcript of a judicial proceeding may be considered on a motion for summary judgment."); *Tingey v. Radionics*, 193 F. App'x 747, 765–66 (10th Cir. 2006) (finding that Rule 32 does not restrict summary judgment evidence and permitting the consideration of a deposition from another proceeding as if it were an affidavit); *Bingham v. Jefferson Cnty.*, No. 11-48, 2013 WL 1312563, at *6 (E.D. Tex. Mar. 1, 2013), *report and recommendation adopted as modified*, No. 11-48, 2013 WL 1312014 (E.D. Tex. Mar. 27, 2013) (same); *Cortez v. Lamorak Ins. Co*., No. 20-2389, 2022 WL 356168, at *3 (E.D. La. Feb. 7, 2022) (same).

not change the result").  Further, the Court finds Defendants have failed to meet their burden to show any prejudice.

### 2.      Answers to Interrogatories

Defendants object to Plaintiff's Exhibits N, O, P, and Q as irrelevant and prejudicial under Rules 401, 402, and 403 of the Federal Rules of Evidence because they are answers to interrogatories in a different proceeding that has different issues and parties.  Defendants also argue that these exhibits lack proper authentication under Federal Rule of Evidence 901.  These objections are mostly frivolous: answers to interrogatories are not to be excluded at the summary judgment stage merely because they involve a different case.  Further, Plaintiff need not authenticate evidence at the summary judgment stage if it can be authenticated at trial.  *See Maurer v. Independence Town*, 870 F.3d 380, 384 (5th Cir. 2017) ("At the summary judgment stage, evidence need not be authenticated or otherwise presented in an admissible form.").

To the extent the answers to the interrogatories are irrelevant, the Court overrules Defendants' objections as moot because "this evidence does not affect the disposition of the summary judgment motion," and Defendants make no showing of prejudice.  *Lilly*, 2022 WL 35809, at *3 n.2; *Jones*, 2008 WL 2627675, at *6.

### 3.      Hearsay Objections

 Defendants object to Plaintiff's Exhibits H, T, U, V, Y, and Z, and Seal E, F, and G, as inadmissible hearsay and lacking proper authentication under Rules 802 and 901 of the Federal Rules of Evidence.  (Docs. 162 at 20; 162-1).  Again, Plaintiff need not authenticate evidence at the summary judgment stage if it can be authenticated at trial.  *See Maurer*, 870 F.3d at 384 ("At the summary judgment stage, evidence need not be authenticated or otherwise presented in an admissible form.").  Further, Defendants and/or their employees produced or wrote Exhibits H,

T, U, V, Seal-E, and Seal-G; therefore, Defendants may not challenge their authenticity. *Barfield v. Fed. Express Corp.*, 351 F. Supp. 3d 1041, 1046 (S.D. Tex. 2019).

Exhibit Y is an administrative opinion that is admissible as a publicly available decision of an administrative law judge subject to judicial notice. Exhibit Z includes publicly available forms from the Texas Workforce Commission Foreign Labor Certification Unit and the United States DOL. Defendants do not contend that Exhibits Y and Z are inauthentic, only that Plaintiff has failed to prove their authenticity. Since Defendants fail to expound on why this evidence should be excluded from the summary judgment other than asserting a blanket hearsay objection, Defendants' objections shall be overruled.

It is therefore **ORDERED** that Defendants' evidentiary objections to Plaintiff's summary judgment evidence are hereby **OVERRULED**. (Doc. 162 at 20).

## IV.   CONCLUSION

For the foregoing reasons, the Court **ORDERS** the following:

Defendant VCI's Motion for Final Summary Judgment is **GRANTED**. (Doc. 150).

Defendant FVS's Motion for Final Summary Judgment is **DENIED**. (Doc. 151).

Defendant Venegas's Motion for Final Summary Judgment is **DENIED**. (Doc. 152).

Plaintiff's Motion for Partial Summary Judgment is **DENIED**. (Doc. 153).

All objections to summary judgment evidence are hereby **OVERRULED**.

It is so **ORDERED**.

SIGNED this 3rd day of June, 2022.

DAVID COUNTS
UNITED STATES DISTRICT JUDGE